IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

Linda Hendrix,                        )
                                      )
              Plaintiff,              )
                                      ) CIVIL ACTION NO.
          vs.                        )
                                      ) 1:19-cv-01773-TCB
The City of Atlanta, Georgia  )
and Marian Woods, in her      )
individual capacity & as      )
Administrator of the Civil    )
Service Board, City of        )
Atlanta,                      )
                                      )
              Defendants.     )


          Deposition of JAMES MERRIWEATHER,

    taken on behalf of the Plaintiff, pursuant

    to the stipulations contained herein, before

    Jo Tomoff Fischer, RMR, CCR No. B-924, at

    55 Trinity Avenue, Suite 5000, Atlanta,

    Georgia, on March 5, 2020, commencing at

    the hour of 2:35 p.m.


Q&A REPORTING SERVICES, INC.
Certified Court Reporters
2221 Peachtree Road, NE, Suite D-517
Atlanta, GA  30309
404.233.3300 ** Admin@QAReporting.com

2

1    APPEARANCES OF COUNSEL

2         ON BEHALF OF THE PLAINTIFF:

3             DEBRA E. SCHWARTZ, ESQ.
              Schwartz Rollins, LLC
4             945 East Paces Ferry Road, Suite 2270
              Atlanta, GA  30326
5             404.844.4130
              des@gaemploymentlawyers.com
6

7

8
          ON BEHALF OF THE DEFENDANTS:
9
              REGINALD C. MARTIN, ESQ.
10            SHIRNELLE R. COUNCIL, ESQ.
              City of Atlanta, Department of Law
11            55 Trinity Avenue, Suite 5000
              Atlanta, GA  30303
12            404.546.4170
              404.546.4163
13            remartin@atlantaga.gov
              srcouncil@atlantaga.gov
14

15

16
     ALSO PRESENT:  LINDA HENDRIX
17

18

19

20

21                        -  -  -

22

23

24

25

3

1                    INDEX TO EXAMINATION

2

3   By Ms. Schwartz. . . . . . . . . . . . . . . . .6

4   By Mr. Martin. . . . . . . . . . . . . . . . . .54

5   By Ms. Schwartz. . . . . . . . . . . . . . . . .61

6   By Mr. Martin. . . . . . . . . . . . . . . . . .65

7

8

9

10                        -   -   -

11

12

13

                      INDEX TO EXHIBITS

14
    PLAINTIFF'S
15    EXHIBIT             DESCRIPTION            PAGE

16      *2     Amended Notice / City of Atlanta   46

17      *3     Definitions of Classified and
                Unclassified Service              39
18
        *4     Turnaround Document / L. Hendrix
19              (COA/HENDRIX00226)                28

20      *5     Turnaround Document / Blank        37

21      *7     Employee Acceptance of
                Unclassified Position Form        21
22
        *8     Oracle Document Screenshot
23              (Hendrix0001, 0002)               43

24       9     Personnel Transaction and
                Certification Form
25              (Hendrix0003)                     51

4

1          10      Employee Acceptance of
                   Unclassified Position /
2                  M. Brown
                   (COA/HENDRIX00456)                    64
3

4
    *Marked in a previous deposition.
5

6

7

8

9

10

11                              -   -   -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1      (THE FOLLOWING TRANSCRIPT CONTAINS QUOTED
        MATERIAL; SUCH MATERIAL IS REPRODUCED AS
2       READ OR SPOKEN.)

3

4

5                          -   -   -

6

7

        (IN THE FOLLOWING TRANSCRIPT, A DASH [ -- ]
8        IS USED TO INDICATE AN UNINTENTIONAL OR
         PURPOSEFUL INTERRUPTION OF A SENTENCE;
9        AN ELLIPSIS [...] IS USED TO INDICATE
         HALTING SPEECH OR AN UNFINISHED
10       SENTENCE IN DIALOGUE, OR AN OMISSION
         OF WORD[S] WHEN READING WRITTEN
11       MATERIAL.)

12

13                         -   -   -

14

15

16      (Thereupon, the court reporter disclosed that she
         was there on behalf of Q&A Reporting Services,
17       Inc.  In compliance with Article 10.B of the Rules
         and Regulations of the Board of Court Reporting
18       of the Judicial Council of Georgia and O.C.G.A.
         15-14-37(a) and (b), the court reporter discloses
19       that she was retained by Schwartz Rollins, LLC,
         to take down the proceedings.  Q&A Reporting
20       Services, Inc., will charge the attorneys the
         usual and customary rate for the transcript,
21       and will be paid by the attorneys upon their
         receipt of the transcript.)

22

23

24

25                         -   -   -

1           MS. SCHWARTZ:  We'll go with the same

2       stipulations from this morning's deposition.

3           MR. MARTIN:  Agreed.

4                   JAMES MERRIWEATHER,

5   having been first duly sworn, was examined and

6   testified as follows:

7                   EXAMINATION

8   BY MS. SCHWARTZ:

9       Q.   Mr. Merriweather, would you spell your last

10  name?

11      A.   Sure.  M-E-R-R-I-W-E-A-T-H-E-R.

12      Q.   And what is your home address?

13      A.   3599 Creekwood Lane, Smyrna, Georgia, 30082.

14      Q.   And how long have you lived there?

15      A.   My daughter is -- 17 years.

16      Q.   And what is your cell phone number?

17      A.   404-447-2832.

18      Q.   And what is your current position with the

19  city?

20      A.   I am the director of labor and employee

21  relations.

22      Q.   How long have you been in that position?

23      A.   I've been in that position since 2017 in

24  interim, 2018 permanent.

25      Q.   What month of 2017, do you know?

James Merriweather - March 5, 2020

7

1       A.    I can't recall that.

2       Q.    Who did you replace?

3       A.    Prior to me was -- was a gentleman by the

4   name of Anthony Davis.

5       Q.    And do you know the circumstances of his

6   leaving?

7       A.    I do.

8       Q.    And what was that?

9       A.    He was -- there was some discrepancy about

10  his educational background.

11      Q.    Was the position vacant at all before you

12  took it?

13      A.    No.

14      Q.    When you moved into that position in 2017,

15  who was the director of human resources?

16      A.    The commissioner, you mean?

17      Q.    Yes.  I'm sorry.

18      A.    The commissioner was Sherri Dickerson.

19      Q.    And do you know the time period she served

20  in that role?

21      A.    Approximately four months.  Four to five

22  months.

23      Q.    And why did she leave?

24      A.    She retired from the city as far as I know.

25      Q.    And who came after her?

James Merriweather - March 5, 2020

8

1       A.    Commissioner Woods.

2       Q.    And do you know when Ms. Marian Woods took

3  over as the commissioner?

4       A.    I'm not sure of the exact -- of the exact

5  date.

6       Q.    Do you know what was her last day on the

7  payroll?

8       A.    I'm not certain of what her last day on the

9  payroll was.

10      Q.    Do you know what was her last day at work?

11      A.    It was around June, June or July, of 20 --

12 I'm not even sure of the year.  2019.

13      Q.    Immediately prior to becoming the director

14 of labor -- I just got your title wrong.

15      A.    Labor and employee relations, yes, ma'am,

16 correct.

17      Q.    Labor and employee relations.  What did you

18 do prior to that?

19      A.    I was labor and employee relations manager

20 prior to that.

21      Q.    And what responsibility did you have in that

22 old job?

23      A.    Primarily to do investigations, consulting

24 with HR business partners, mediation.

25      Q.    And what type of investigations?

James Merriweather - March 5, 2020

9

1      A.   They were wide-ranging.  Mostly they are

2 Title VII investigations.

3      Q.   What is the overall responsibility of labor

4 and employee relations?

5      A.   Our scope really is to resolve internal

6 complaints, we're appointed deescalation for

7 high-profile investigations, and we also have

8 responsibility for EEOC complaint resolution.

9      Q.   What role, if any, do you have with regard

10 to the Civil Service Board?

11      A.   My staff -- I have a person on my staff that

12 coordinates the Civil Service Board.  So we act as the

13 administrative arm of the Civil Service Board to

14 assist them in setting up hearing dates and carrying

15 out their duties as a Civil Service Board.  Ultimate

16 responsibility of that is under the commissioner of

17 HR.

18      Q.   And when you say they "coordinate," other

19 than doing dates and maybe getting hearing folks

20 together --

21      A.   Yes, ma'am.

22      Q.   -- did they do anything substantively in

23 dealing directly with the issues before the Civil

24 Service Board?

25      A.   No, ma'am.

James Merriweather - March 5, 2020

1    Q.    How would you learn, or your office learn,

2    that there was going to be a hearing before the Civil

3    Service Board?

4    A.    So the -- the process is that people come to

5    the HR commissioner's office, since we're an arm of

6    that as the -- as the labor and employee relations

7    office, they submit those Civil Service Board appeals

8    to our office.

9    Q.    How do employees know that they're supposed

10   to submit an appeal to the civil service to your

11   office?

12   A.    Per the process, when -- when an employee

13   who is a classified employee receives a notice of

14   final adverse action decision, with that they are

15   given the Civil Service Board appeal form and they're

16   told of their rights to file an appeal within a

17   certain period of time.

18   Q.    And they're told where to go for filing --

19   A.    They're told --

20   Q.    -- the appeal?

21   A.    -- where to go to file it, yes, ma'am.

22   Q.    And was that process in effect in

23   December of 2017?

24   A.    It was.

25   Q.    And how about in the first half of 2018?

1      A.    It was.

2      Q.    And since then?

3      A.    It has been.

4      Q.    And what personal involvement, to your

5  knowledge, does the deputy commissioner of human

6  resources have or the commissioner of human resources

7  have with regard to the Civil Service Board?

8      A.    As far as the deputy commissioner, I don't

9  know what role as far as code.  I don't think there's

10  any role for them.  As far as the HR commissioner,

11  they are the ultimate responsibility.  The Civil

12  Service Board is under their -- their purview.

13      Q.    And what does that involve in having the

14  ultimate responsibility?

15      A.    They sign off on the -- speaking of the

16  commissioner, the commissioner signs off on subpoenas

17  for the Civil Service Board.  They're ultimately

18  responsible for decisions that are escalated with the

19  Civil Service Board.

20      Q.    I'm sorry.  They sign off on the decision of

21  whether to uphold or overrule the decision from the...

22      A.    What I -- what I said was they -- they sign

23  off on subpoenas for witnesses for the Civil Service

24  Board.

25      Q.    Okay.

James Merriweather - March 5, 2020

1       A.    And they have ultimate responsibility for

2   the Civil Service Board.

3       Q.    So if something's not operating correctly

4   with the Civil Service Board, they're responsible?

5       A.    The Civil Service Board is their

6   responsibility, yes.

7       Q.    Well, I know there have been times where

8   they have suspended hearings before the Civil Service

9   Board for multiple different reasons.  And would that

10  be something that would have to be handled by the

11  commissioner of HR?

12      A.    Could you clarify what you -- what you mean

13  by that?

14      Q.    I know at times there has been too much work

15  for the Civil Service Commission and not enough

16  hearing officers and they've had to suspend.

17            Do you know who would be the ultimate person

18  to make the decision that they could suspend?

19      A.    I don't know who -- who ultimately made that

20  decision.  I know that the human resources

21  commissioner was involved in a pause in the board that

22  happened most recently that I'm aware of.

23      Q.    And when was the most recent time?

24      A.    That was January 2016.  It was paused --

25      Q.    It was what?

13

1      A.    It was paused in January of 2016.

2      Q.    And do you have any idea how long it was

3   paused for?

4      A.    It was paused until May of 2016 where it was

5   reinstated.  And then in June was the first hearing

6   after that pause, June 2016.

7      Q.    Who was the commissioner when it was

8   reinstated?

9      A.    That was Commissioner Yancy.  Yvonne Yancy.

10      Q.    And are you familiar with when Ms. Yancy

11   left the commissioner's office?

12      A.    I can't recall the exact date, no, ma'am.

13      Q.    Did she leave with the change in the

14   administration, which would have been January 2018?

15      A.    It probably was -- it probably was around

16   that time, yes, ma'am.

17      Q.    Do you know why she left?

18      A.    No, ma'am.

19      Q.    Do you know whether there's any litigation

20   with Ms. Yancy?

21      A.    I'm not aware, no, ma'am.

22      Q.    When did you first start working for the

23   city?

24      A.    January 7th, 2010.

25      Q.    And who do you report directly to?

14

1      A.   I report directly to Commissioner Norman.

2      Q.   You seemed to hesitate for a second.  Is

3  there some functions you report to someone else?

4      A.   No.  I hesitate because we've had --

5      Q.   So many?

6      A.   -- a lot of ebb and flow, yes, ma'am.

7      Q.   You had to think about who was in that job

8  right now, right?  But at all times you report to the

9  commissioner --

10      A.   Commissioner, yes.

11      Q.   -- of human resources?

12      A.   Of human resources.

13      Q.   Now --

14      A.   There have been times where I've had a

15  dotted line to a -- a deputy commissioner, but at this

16  time it's directly to Commissioner Norman.

17      Q.   Currently there's a deputy commissioner

18  position vacant.  Do you know how long it's been

19  vacant?

20      A.   I'm not sure.

21      Q.   Do you know what responsibility that

22  position handles within human resources?

23      A.   Normally there're departments that --

24  normally there are departments that -- or department

25  heads as far as within HR, HR directors, that report

15

1    to that -- to various deputy commissioners.  And they

2    also take on special projects at the request of the

3    commissioner.

4         Q.   There's been some talk about HR partners.

5    Can you explain what that is?

6         A.   So at one time the -- the HR directors were

7    housed and operated out of the different departments.

8    Now they were -- under Commissioner Yancy they were

9    consolidated, but they still serve under the

10   department.

11             So, for example, if you have -- there's an

12   HR director that's assigned to work with watershed,

13   department of watershed, so we would consider that

14   person an HR business partner.

15        Q.   And in 2017, did that individual work out at

16   watershed?

17        A.   They're housed different places.  Yeah, I

18   believe in 2017 they still would have been housed at a

19   site with their business part -- with -- with the

20   department.

21        Q.   And what about with regard to the airport?

22   Who was the commissioner of HR for the airport in

23   2017?

24        A.   Probably was Jim -- I -- I don't recall

25   exactly, but I believe it was Jim Beam.

16

1    Q.   Did you ever work directly with Mr. Beam?

2    A.   Yes, ma'am.

3    Q.   And in what capacity?

4    A.   Mr. Beam had several positions and I worked

5  with him in several positions.  He was the deputy

6  commissioner of HR at one point.  He became the HR

7  director out at aviation.  So I worked with him in

8  both capacities in my role.

9    Q.   Do you know when he left?

10   A.   I don't recall when he left.

11   Q.   Do you know why he left?

12   A.   No, I don't know why he left.

13   Q.   Do you know where he's working now, if --

14   A.   I do not.

15   Q.   -- you know?

16   A.   Huh-uh (negative).

17   Q.   What is your understanding of how the HR

18  directors and their staff interact with human

19  resources for the city?

20   A.   Could you explain what you mean by that

21  question?  I mean, how --

22   Q.   What functions does HR at the airport --

23   A.   Uh-huh (affirmative).

24   Q.   -- when they were at the airport because

25  your -- is it your testimony they're no longer at the

17

1  airport?

2       A.   No.  They're still at the airport.

3       Q.   So the HR employees working at the airport,

4  what roles did they have versus HR home office?

5       A.   So every HR business partner that works

6  within the department, including aviation, handles the

7  HR functions for that particular department.  So

8  there's usually somebody that's assigned to recruit

9  for the -- for the airport.  There's someone assigned

10 to handle other labor relations that we don't -- that

11 my office doesn't handle -- hiring, dismissals,

12 disciplinary actions, training.  So for each

13 department it's the same.  And aviation wouldn't be

14 different.  That HR team would handle all the HR

15 functions for that particular department.

16      Q.   And with regard to dismissals --

17      A.   Uh-huh (affirmative).

18      Q.   -- what's the role of the HR partner?

19      A.   It's their responsibility to follow the

20 disciplinary process and for classified employees to

21 issue disciplinary action as -- as appropriate.

22      Q.   Then is one of the policies the progressive

23 discipline policy?

24      A.   It is.

25      Q.   And they're supposed to follow that?

James Merriweather - March 5, 2020

1      A.    They are.

2      Q.    And is there a formal document when you are

3  going to write an employee up that's considered to be

4  a written warning?

5      A.    That written warning is -- it -- it varies

6  across the city, what -- the format it takes.  But,

7  yes, they -- there is a form that they would use at

8  the airport, yes.

9      Q.    And where would someone find that form?

10     A.    Who would -- meaning who?

11     Q.    If I were trying to get ahold of a copy of

12  that form, what department would I go to or who would

13  I talk to?

14     A.    Well, the form is used by HR so you would go

15  to HR to get that particular form.

16     Q.    So are you aware of any disciplinary action

17  form that exists for the city generally or for the

18  department of aviation generally where you can tell us

19  the name of the form?

20     A.    The forms that -- as far as discipline that

21  I can tell you about would be when it becomes to

22  adverse action.

23     Q.    And what kind of form is that?

24     A.    So there would be a notice of proposed

25  adverse action.  That's a standard form.  There would

James Merriweather - March 5, 2020

19

1   be a notice of final adverse action.  And then there
2   would be a Civil Service Board appeal form.
3        Q.   Who prepares the notice of proposed adverse
4   action?
5        A.   The HR business partner would prepare that
6   notice of final ad -- adverse action with -- in
7   conjunction with the supervisor or manager.
8        Q.   Talking strictly about the department of
9   aviation --
10       A.   Uh-huh (affirmative).
11       Q.   -- and turning your attention to December of
12   2017, who would have been in the position to handle
13   creating notices of proposed adverse actions?
14       A.   That I don't know for that particular date
15   and group.
16       Q.   Would it have been one person or more than
17   one person?
18       A.   It could have been more than one person.
19       Q.   How does an individual HR partner know to
20   prepare a notice of proposed adverse action?
21       A.   So the notice of proposed adverse action
22   would really -- it's a responsibility of the super --
23   individual supervisor or manager.  The HR business
24   partner would assist that supervisor or manager in
25   preparing that form.

James Merriweather - March 5, 2020

1      Q.   And how do individual managers know that
2   they're required to fill out this notice of proposed
3   adverse action?
4      A.   That's part of the -- the municipal code.
5   So the process for that is outlined in the municipal
6   code.
7      Q.   Do you happen to know what section?
8      A.   So it would be section 114 and it would
9   be -- they would have to have a cause for action,
10  which is 528, so 114-528.  They would also follow the
11  procedure for adverse action, which I believe is 527.
12     Q.   And whose responsibility was it to prepare
13  the notice of final adverse action?
14     A.   In this case, I...
15     Q.   In the department of aviation, just
16  generally.
17     A.   In general, the -- again, the HR BP would
18  assist the supervisor or manager in preparing that
19  notice of final adverse action.  It would then be
20  signed off on by the -- by that supervisor and by the
21  department head in -- in -- in aviation's case, it
22  would be the general manager.
23     Q.   Are there any circumstances you're aware of
24  that a classified employee does not have to be given a
25  notice of final proposed adverse action?

James Merriweather - March 5, 2020

21

1      A.    None that I'm aware of.

2      Q.    Is there any circumstances in which a

3   classified employee does not have to be told of their

4   appeal rights to the Civil Service Commission?

5      A.    None that I'm aware of, no, ma'am.  Oh, in

6   the previous question, it -- you -- you asked me about

7   the code section.  There's another -- there's two

8   other portions of that section 114.  529 and 530 also

9   discuss imposing those actions.

10     Q.    Showing you Plaintiff's Exhibit No. 7.  Can

11  you identify that?

12     A.    It's an employee acceptance of unclass -- of

13  an unclassified position.

14     Q.    And for whom is that form used at the

15  City of Atlanta?

16     A.    Normally it's used for employees that are

17  moving from a -- a classified position to an

18  unclassified position.

19     Q.    But can it also be at the time they're hired

20  if they're into an unclassified position?

21     A.    It can be at the time of hire as well, yes,

22  ma'am.

23     Q.    So if a person is moving from a classified

24  position to unclassified, who generates Plaintiff's

25  Exhibit No. 7?

22

1      A.   If they're moving, normally the HR -- HR BP

2  would -- would generate this form.

3      Q.   And when you say that, is it the top person

4  in the department or is somebody working under them?

5      A.   Depending on why they're -- they're moving

6  from un -- classified to unclassified, it could be the

7  top person, it could be someone else underneath them.

8      Q.   Are you familiar with how long either that

9  form or a form similar to it has been used at the

10  city?

11      A.   As far as I know, it was -- it would

12  probably be after February 13th of '98.

13      Q.   What happened on February 13th of '98?

14      A.   I just know per the code that's the date

15  that the classified/unclassified service was -- was

16  set up and employees were designated into those

17  categories.

18      Q.   And isn't it true that if someone was on

19  February 12th --

20      A.   Uh-huh (affirmative).

21      Q.   -- of 1998 a classified employee --

22      A.   Uh-huh (affirmative).

23      Q.   -- it would only switch to an unclassified

24  position potentially if they were to leave the

25  position they were in and take another position?

1       A.    That I'm not aware of.

2       Q.    Who would be responsible for handling any

3   kind of change of classification as a result of this

4   February 13th, '98...

5       A.    It would be in HR, but I'm not sure who

6   would have that -- it wouldn't be labor relations'

7   responsibility.

8       Q.    Now, you're aware that Linda Hendrix was a

9   classified employee when she was hired?

10      A.    I had -- I am from my research for this,

11  yes.

12      Q.    Let's talk about your research for this.

13  What have you done to prepare for today's deposition?

14      A.    So I've reviewed the code, reviewed

15  policy -- standard policy and procedure, I've met with

16  the city attorneys.

17      Q.    And when you say "the city attorneys,"

18  anyone other than who's in this room?

19      A.    No, I don't -- I don't believe so, no.

20      Q.    Have you had any meetings with Mr. Norman

21  about this case?

22      A.    No.

23      Q.    When Mr. Norman was in the city attorney's

24  office, did you deal with him in personnel matters?

25      A.    Yes.  There were times where we -- where we

24

1    dealt with things.

2         Q.   And would it usually be with regard to

3    EEO-type issues?

4         A.   It'd be -- it'd be in regards to

5    integrity-line-type issues, compliant --

6    law-compliance-type issues.

7         Q.   So you said you reviewed the code and you

8    talked to the city attorneys.

9         A.   Yes.

10        Q.   Did you look at any documents beside the

11   code?

12        A.   We did -- I did look at the documents --

13   these documents you have in front of you, the --

14   forgive me.  I don't -- I don't know what these are

15   called, but...

16        Q.   Plaintiff's Exhibit 1, I will show you --

17        A.   Okay.

18        Q.   -- is that the document?

19        A.   Yes.

20        Q.   Which is the notice of deposition.

21        A.   Yes.

22        Q.   And then there was a first amended notice of

23   deposition?

24        A.   Yes.  Those, yes, ma'am.

25        Q.   Did you look at any documents this morning?

James Merriweather - March 5, 2020

25

1      A.   Besides the code, no.  And these -- and
2   these depositions.
3      Q.   Have you looked at Ms. Hendrix's personnel
4   file, either now or at any time since --
5      A.   Yes.
6      Q.   When's the last time you would have reviewed
7   that?
8      A.   Maybe two weeks ago.
9      Q.   What were the circumstances of your
10   reviewing it?
11      A.   I had pulled the file in -- in the past.  So
12   a request was made to me to pull her file.  So when I
13   met with the city attorneys, I had that as something
14   that I had pulled at the time.  It was not the most
15   recent version of it, but it was what was pulled at
16   the time it was requested.
17      Q.   Do you have a rough idea of when you first
18   pulled her file?
19      A.   It must have been a -- more than a year ago.
20      Q.   Would it have been after the lawsuit was
21   filed?
22      A.   That I'm not aware.
23      Q.   So when did you first become aware of the
24   lawsuit?
25      A.   When I was contacted for this deposition.

26

1      Q.   So would it have been in 2020?

2      A.   Yes, ma'am, 2020.  Yes.

3      Q.   And so in 2019, you had no role in dealing

4  with this lawsuit?

5      A.   No, ma'am.

6      Q.   So the first time you were contacted to pull

7  her file would have been in 2020 as well?

8      A.   No.  It was -- there was -- I went back

9  to -- to see what I had on file.  And what I had was

10  her personnel file and a request that I had made to

11  someone to -- to pull the file that -- up in our

12  business office.  I'm not even sure why.  I had no

13  other notes as to why.

14      Q.   Okay.  When you pulled that file --

15      A.   Uh-huh (affirmative).

16      Q.   -- did you see that there were several

17  documents that showed that Ms. Hendrix was a

18  classified employee?

19      A.   Yeah, there were some documents that showed

20  that she had been classified employee.

21      Q.   And did you notice that there were no forms

22  in which she waived her rights by moving into a

23  classified position, such as document 7?

24          MR. MARTIN:  Objection to form.

25          I mean, you may answer.

27

1          THE WITNESS:  I -- I did not see this --
2      this -- a form like this or this form in that
3      file.
4  BY MS. SCHWARTZ:
5      Q.   Have you looked at the personnel file for
6  Ms. Brown, Marcia Brown?
7      A.   No.
8      Q.   Did you see anything in the personnel file
9  that you pulled regarding Ms. Hendrix that showed that
10  she was an unclassified employee?
11      A.   Yes.
12      Q.   And what was that?
13      A.   It was a TAD that showed -- I believe it was
14  a termination TAD.  The -- the TAD showed her as an
15  unclassified employee.
16      Q.   And are you referring to Plaintiff's
17  Exhibit No. 4?
18      A.   I believe this is it, yes, ma'am.
19      Q.   And what's the date on that?
20      A.   The date is March 21st, 2018, effective
21  date.
22      Q.   Give me one second.  Let's go to received
23  June 4th, 2008, which is sort of a big block.  Go down
24  that...
25          MS. COUNCIL:  Can you restate, just for

James Merriweather - March 5, 2020

28

1         purposes --

2                   MR. MARTIN:  Oh, right where?

3                   MS. COUNCIL:  -- of clarification,

4         Ms. Schwartz, it's 2018?  We just want to

5         make sure the date's properly reflected on

6         the record.

7                   MS. SCHWARTZ:  This is --

8                   MS. COUNCIL:  This is June 4th, 2018?

9                   MS. SCHWARTZ:  Yes.

10                  MS. COUNCIL:  You said 2008.

11                  MS. SCHWARTZ:  I'm sorry.

12                  MS. COUNCIL:  Just want to make sure the

13        record is clear.

14    BY MS. SCHWARTZ:

15        Q.   2018.  And it's got the number 0226 as a

16    Bates stamp number.

17                  Can you see whose signature is in the

18    received area?

19        A.   I can't tell whose signature that is, no,

20    ma'am.

21        Q.   Do you know whose signature is at the bottom

22    left dated 6-4 or 6-1, I'm not sure, and it looks like

23    a J something?

24        A.   I'm not familiar with that -- with that

25    signature.  I was told whose it might be, but I'm --

James Merriweather - March 5, 2020

1    I'm not familiar with whose -- whose it is.

2          Q.    Who told you whose it might be?

3          A.    Ms. Kirkland, Renita Kirkland.

4          Q.    And who did she say it might be?

5          A.    Jim Beam.

6          Q.    And on the bottom right, it says TAD process

7    date --

8          A.    Uh-huh (affirmative).

9          Q.    -- 6-5-18.  And can you tell whose initials

10   those are?

11         A.    I can't.

12         Q.    When did you first talk to anyone about this

13   document?

14         A.    In our meetings with -- with the -- the city

15   attorney.

16         Q.    And who was in the meetings with the city

17   attorney besides yourself?

18         A.    The city attorneys present in the room right

19   now and Renita Kirkland, Ms. Brown, and Alisha --

20   Alisha Williams.

21         Q.    Ms. Williams being an employee of the city

22   attorney's office?

23         A.    Yes.

24         Q.    And were you shown any documents during that

25   meeting?

James Merriweather - March 5, 2020

1      A.   The documents we were shown were the

2   personnel file and -- because I brought the personnel

3   file, and then -- that personnel file, and then these

4   documents that you've presented to me.  These two,

5   notice of deposition.

6      Q.   Which is Plaintiff's Exhibits 1 and 2, just

7   for the record.

8           When you brought over the personnel file, it

9   did not have any disciplinary action forms in it, did

10  it?

11          MS. COUNCIL:  Objection to the form of

12      your question.

13          THE WITNESS:  I can't -- I can't recall

14      any disciplinary documents in it.

15               (Mr. Martin exited the room.)

16  BY MS. SCHWARTZ:

17     Q.   Did you see any notices that were given to

18  employees that we've talked about, notice of proposed

19  adverse action or final adverse action?

20     A.   I don't recall those being as part of that

21  file.

22     Q.   Are there any other documents that you

23  looked at directly with the city attorneys and these

24  other four individuals?

25     A.   This document was a part of that file, this

James Merriweather - March 5, 2020

1  TAD.

2       Q.   What is your understanding of why a TAD

3  document for Ms. Hendrix who was terminated on

4  December 27th of 2017 would be generated on 6-5 of '18

5  or thereabouts?

6            MS. COUNCIL:  I'll object to the form of

7       that question.  I think it's also misstating

8       the facts of the case.  According to the

9       records, she was not terminated in December

10      2017.

11           MS. SCHWARTZ:  We disagree with you on

12      that so...

13           MS. COUNCIL:  Well, I think it's a

14      mischaracterization of the facts to the

15      witness.

16           MS. SCHWARTZ:  I will rephrase the

17      question.

18  BY MS. SCHWARTZ:

19      Q.   You are aware that the last day that

20  Ms. Hendrix worked was December 27th of 2017?

21      A.   That part I'm not aware of.  I'm not aware

22  of the details of that part of her termination.

23      Q.   What reason would there be for any employee

24  to not get a TAD document entered into their file for

25  five months after their last day worked?

32

1      A.    That wouldn't be my area of expertise on

2   TADs.

3      Q.    So you have no idea why this particular

4   document was created?

5      A.    I couldn't answer that.  Only that -- that

6   it was a dismissal.

7      Q.    And you don't know who created the document?

8      A.    No, ma'am.

9      Q.    And what did Ms. Kirkland say about who she

10  thought created the document?

11         MS. COUNCIL:  Asked and answered.

12         But you may answer.

13         I think he's already answered that.

14         THE WITNESS:  I believe Jim Beam.  She

15      said Jim Beam was this signature here, that

16      she believed that.  Who created the document,

17      I don't recall that she had a specific answer

18      of who -- who did it.  She had possibilities

19      of people that could have created it.

20  BY MS. SCHWARTZ:

21      Q.    Who were the other possibilities?

22      A.    The executive assistant to the -- to the HR

23  director, Mr. Beam.

24      Q.    Was that Ms. Brown?

25      A.    Ms. Cooper I think her name is.  Chyna --

James Merriweather - March 5, 2020

33

1      Q.   Chyna Cooper?

2      A.   -- Cooper.

3      Q.   Did she have any other possible suggestions?

4      A.   She named another person, but I can't recall

5   who that was.

6      Q.   And you have no knowledge as to whether the

7   information contained on this document is accurate, or

8   not, do you?

9      A.   No, ma'am.  That's not my area.

10      Q.   Have you done anything to investigate how

11   this document came to be in existence?

12      A.   Huh-uh (negative).  I've done no

13   investigation on this particular matter.

14      Q.   Are there any discussions that you've had

15   with Ms. Kirkland where the city attorney was not

16   present?

17      A.   Sure.  We waited in the lobby together.

18      Q.   No.  I mean, about this particular --

19      A.   Oh, no, ma'am.

20      Q.   -- lawsuit.  What about Ms. Brown, any

21   conversations with her separately?

22      A.   No, ma'am.

23      Q.   How long was your meeting with the city

24   attorneys and Ms. Kirkland and Ms. Brown?

25      A.   We met on a couple of different occasions.

James Merriweather - March 5, 2020

34

1   They were probably a couple of hours each.

2        Q.   And other than Plaintiff's Exhibit 4, did

3   you see a single document that showed that Ms. Hendrix

4   was unclassified?

5        A.   I can't recall seeing any other documents

6   besides -- besides this one that -- that had her as

7   class -- unclassified.

8        Q.   Assuming that at the time she was sent home

9   that Ms. Hendrix was a classified employee, should she

10  have received a notice of adverse action?

11            MS. COUNCIL:  Could you clarify that

12       question a little bit more?  When you say

13       "sent home," give us a specific time.

14  BY MS. SCHWARTZ:

15       Q.   Suspended on December the 27th of 2017.

16       A.   If she was a classified employee, she

17  would -- we would follow the procedure for a

18  classified employee.  She would have gotten a notice

19  of proposed adverse action.

20       Q.   And if she were to still be terminated, she

21  would have gotten a final notice?

22       A.   Yes.

23       Q.   And then if the decision were made to

24  terminate her, would she have been provided

25  information about filing an appeal?

35

1       A.   Yes.

2       Q.   Have you had any discussions with anybody,

3  other than counsel, as to whether or not Ms. Hendrix

4  attempted to file appeals with the Civil Service

5  Commission?

6       A.   Yes.  I spoke with my CSB coordinator to see

7  if there was an appeal that was filed.

8       Q.   And what was the name of your CSB

9  coordinator?

10      A.   Kandice Harmon.

11      Q.   Harmon?

12      A.   Harmon, H-A-R-M-O-N.  Kandice with a K,

13  K-A-N-D-I-C-E.

14      Q.   And what specifically is her job title?

15      A.   She -- her job title is employee relations

16  specialist.  She coordinates the -- the CSB hearings

17  and does the scheduling for those.  And -- and other

18  duties.  But as it relates to this, those are her

19  duties.  She's a coordinator for the CSB.

20      Q.   And what did she tell you?

21      A.   No, there was no -- there was no appeal that

22  was -- that was submitted.

23      Q.   And where is she located physically?

24      A.   Suite 2170 at City Hall.

25      Q.   She's in your...

James Merriweather - March 5, 2020

36

1      A.    In my suite, yes, ma'am.

2      Q.    Did you talk to anybody else about any

3   appeals that Ms. Hendrix may have submitted?

4      A.    No, ma'am.

5      Q.    Have you had any discussions with anyone

6   other than counsel about whether or not Ms. Hendrix

7   was a classified or unclassified employee?

8      A.    No, ma'am.

9      Q.    Have you done any independent research to

10  determine if she was a classified or unclassified

11  employee?

12     A.    No, ma'am.

13           (Mr. Martin entered the room.)

14  BY MS. SCHWARTZ:

15     Q.    Other than the personnel file that you

16  brought with you to the meeting with counsel --

17     A.    Yes, ma'am.

18     Q.    -- have you looked for any other documents

19  with regard to Ms. Hendrix?

20     A.    So Ms. Harmon, we checked our hard copy

21  files, electronic submissions, just to -- and our

22  spreadsheets on submissions just to make sure there

23  was no -- nothing that we had missed.  And we --

24  there's nothing we found.

25     Q.    What were you looking for?

37

1      A.    Just looking for the CSB, Civil Service
2  Board, appeal form.
3      Q.    The appeal form.  Did you check the
4  commissioner's email?
5      A.    I wouldn't have access to that, no, ma'am.
6      Q.    So that was nobody checked that, to your
7  knowledge?
8      A.    Yeah, I -- I am not aware.
9      Q.    Were there some employees that were
10 classified employees before February 13th of 1998 who
11 then changed to become unclassified employees at some
12 later date?
13     A.    There were.
14     Q.    And were those individuals asked to fill out
15 a form similar to Plaintiff's Exhibit 7?
16     A.    That is our general practice.  It's not --
17 it's not necessarily a policy, but that has been the
18 practice, yes, ma'am.
19     Q.    How can you tell if an employee has moved
20 into a vacant position?
21     A.    That would be outside of my area of
22 expertise.
23     Q.    I'm showing you Plaintiff's Exhibit 5, which
24 is called the turnaround document.
25     A.    Uh-huh (affirmative).

James Merriweather - March 5, 2020

38

1       Q.    Can you tell me how long either that
2   document or something similar to it has been used?
3       A.    Again, I'm not -- I'm not -- it's been here
4   as long as I've been here, since 2010.
5       Q.    That's --
6       A.    Prior to that, I don't -- I don't know.
7       Q.    And what is your understanding of the
8   purpose of such a document?
9       A.    My understanding is that it's used to make
10  HR changes in title, position, salary, et cetera.
11      Q.    Are you aware of any employees who moved
12  from classified positions to unclassified positions
13  and retained some rights to hearings?
14      A.    I'm not aware of any employees specifically.
15  I have heard of it, yes.
16      Q.    Are you familiar with the policy or not
17  particularly?
18      A.    Yes, I'm familiar with the policy.
19      Q.    And what is the policy?
20      A.    There's a policy that some classified
21  employees are moved to unclassified positions, but
22  they retain their civil service rights.
23      Q.    And what determines if they will or will not
24  retain their civil service rights?
25      A.    That I don't know.  Don't know what the --

39

1   that criteria is.

2       Q.   I'm showing you Plaintiff's Exhibit No. 3.

3       A.   Uh-huh (affirmative).

4       Q.   If you could...  Towards the bottom of the

5   page, there is the reference to all positions in

6   classified service at pay grade 19 and above that

7   become vacant on or after February 13th, 1998, will be

8   transferred to unclassified.

9            What is your understanding of a position

10  becoming vacant?

11      A.   Again, not my area of expertise, but my

12  understanding of it is that -- that if a position

13  is -- that if a position was going to be filled after

14  that date at that pay grade, 19 and above, that that

15  position would be termed an unclassified position.

16      Q.   So it wouldn't necessarily impact the person

17  in the position at the time unless it was going to be

18  opened up as a new position, correct?

19      A.   That I don't know.  That's -- that I don't

20  know.

21      Q.   Who would be able to answer that question?

22      A.   It would review -- it would depend on a

23  review of the ordinance attached with this, but the

24  HR BP may be able to answer that particular question

25  or the -- the deputy commissioner.

40

1       Q.   The deputy commissioner?

2       A.   Uh-huh (affirmative).

3       Q.   What about the commissioner?

4       A.   Or the commissioner.

5       Q.   If an employee is terminated and that

6    employee is not in a classified position --

7       A.   Uh-huh (affirmative).

8       Q.   -- what rights, if any, do they have with

9    regard to either notice or a hearing?

10      A.   If they are an unclassified employee,

11   they're considered in -- in Georgia at will.  And they

12   can be separated -- either the employee or the

13   employer can separate at will, with -- with or without

14   cause.

15      Q.   And is the policy of the City of Atlanta to

16   separate an employee without telling them why they're

17   being separated?

18      A.   The policy simply says they're at will.  And

19   if they -- each party, each side, has the right to

20   separate employment.

21      Q.   That's what the written policy says.  I'm

22   asking about the actual policy.  Is it the policy --

23      A.   The practice or do you mean --

24      Q.   Yes, practice, if you will.  Is it the

25   practice to tell the employee why they are being

James Merriweather - March 5, 2020

41

1    terminated?

2         A.    It's the practice to have progressive

3    discipline, it's the practice to have performance

4    evaluations.   But as far as separation, it's our

5    practice to -- it's at will for unclassified

6    employees.

7         Q.    Now, doesn't the State of Georgia require

8    that you give them a separation notice?

9              MS. COUNCIL:   Objection to the form of

10        the question.

11             THE WITNESS:   They do require that.

12   BY MS. SCHWARTZ:

13        Q.    And does the city fill in a reason for

14   termination?

15        A.    It does.

16        Q.    And do they fill in a date for termination?

17        A.    They do.   The reason doesn't have to be --

18   sometimes the reason is termination.

19        Q.    Do you have any knowledge about who notified

20   Ms. Hendrix that she was terminated?

21        A.    I don't.

22        Q.    If an employee is unclassified but had

23   reserved rights to a hearing, what kind of information

24   would they be provided with at the time of

25   termination?

James Merriweather - March 5, 2020

42

1      A.   Could you clarify what you mean by reserve

2  rights to a hearing?

3      Q.   Yes.  We talked earlier about there were

4  some employees that were moved into an unclassified

5  position but retained rights to a Civil Service Board

6  hearing.

7      A.   Yes.

8      Q.   How would they be notified that they had

9  those rights to a hearing?

10      A.   If they had retained rights, then they would

11  be considered the same way -- or have the same rights

12  as a classified employee.  So they would get -- go

13  through the same process.  They'd get a -- a notice of

14  proposed adverse action, they'd have a -- a show-cause

15  hearing where they can respond, they'd get a notice of

16  final adverse action with an appeal form and told of

17  their rights to file a Civil Service Board appeal.

18      Q.   Are there any circumstances under which

19  you're aware that the policy permit a classified

20  employee to be terminated without that process of the

21  notice and the right to a hearing --

22      A.   For classified employees, no.

23      Q.   For classified employee.

24      A.   Not that I'm aware of, no, ma'am.

25      Q.   What if at the time that an employee is

43

1   terminated the supervisor isn't sure if he or she, the

2   subordinate, is classified or not?  What are they

3   supposed to do?

4        A.   Normally they would check the system of

5   record at that time.  At the time I'm not sure whether

6   it was ATL Cloud or Oracle.  Probably Oracle.  You

7   would check the Oracle system to see if the -- what

8   the status of the employee was.  If you were uncertain

9   about the system, you could check the personnel file

10  and the personnel file should have that -- that status

11  recorded there as well.

12       Q.   So you're not sure when Oracle was used or

13  ceased to be used?

14       A.   I'm not a hundred percent certain, no,

15  ma'am.

16       Q.   I'm showing you what's previously been

17  marked as Plaintiff's Exhibit 8.

18       A.   Okay.

19       Q.   So if you would look --

20       A.   This is 3, 5, 7, 4.  3, 4, 5, and 7.

21       Q.   No, that's not it.

22            MS. SCHWARTZ:  Do you have Plaintiff's

23       Exhibit 8?  That's that one.  Do you mind

24       sharing that with the witness for now and

25       we'll look for it.

44

1           MR. MARTIN:  No problem.

2           MS. SCHWARTZ:  Thank you.

3    BY MS. SCHWARTZ:

4      Q.   Looking at Plaintiff's Exhibit 8, which is

5    two pages, does this appear to be a screenshot from

6    Oracle or one of the other programs that you

7    referenced?

8      A.   It looks like a screenshot from Oracle.  It

9    could be.

10     Q.   And how would such a document get generated?

11     A.   In the old Oracle system, it's not that

12   advanced.  You would do a -- you would do a -- a print

13   from -- there's a print screen from this or a -- a

14   pop-up print to print out this page.

15     Q.   If you turn to the second page --

16     A.   Uh-huh (affirmative).

17     Q.   -- does that appear to be just an enlarged

18   version of the previous page?

19     A.   It appears to be.

20     Q.   Have you ever had occasion to pull up on

21   your screen the Oracle program while also having your

22   Gmail open?

23     A.   I haven't, no, but -- no, ma'am.

24     Q.   Do you have any knowledge as to whether or

25   not the information contained in this document is

James Merriweather - March 5, 2020

45

1    correct?

2         A.   No, ma'am.

3         Q.   Have you seen this before?

4         A.   Have I read what you're -- what you're --

5    have here, no, ma'am.

6         Q.   So you didn't see this earlier today?

7         A.   I did see this at a distance, but I

8    didn't -- I didn't read it.

9         Q.   Did you discuss it with the deputy

10   commissioner?

11              MR. MARTIN:  Objection to the form.

12              THE WITNESS:  No, ma'am, I didn't.  No,

13        ma'am, I didn't discuss it with the deputy

14        commissioner.

15   BY MS. SCHWARTZ:

16        Q.   What is the purpose of the City of Atlanta's

17   performance appraisal system?

18        A.   It's -- it's to -- it's to evaluate

19   performance.  It's -- it's used -- at times it's been

20   used to validate whether someone's gonna get a -- a

21   raise or not.  It's also to point out if there's poor

22   performance and look at opportunities to improve that

23   performance.

24        Q.   Have you had an opportunity to look over

25   Ms. Hendrix's performance reviews?

James Merriweather - March 5, 2020

46

1      A.   I haven't, no, ma'am.  I'll clarify that I

2  have seen them, but I have not reviewed them.

3      Q.   I understand.  Thank you.  If you would look

4  at Plaintiff's Exhibit No. 2.

5      A.   Yes, ma'am.

6      Q.   Yes.  And look at number 14.

7      A.   Yes, ma'am.

8      Q.   What's the city's policy and procedure in

9  the time frame of December 2017 of the role that a

10 supervisor or department head plays in providing a

11 terminated employee with the --

12          MR. MARTIN:  I'm sorry.  Which number

13      are you on again?

14          MS. COUNCIL:  Which number?

15          THE WITNESS:  14.

16          MS. SCHWARTZ:  14.

17          MS. COUNCIL:  Okay.

18          MR. MARTIN:  Thank you.

19          THE WITNESS:  So for -- for classified

20      employees?

21 BY MS. SCHWARTZ:

22      Q.   You can tell me that first.

23      A.   Okay.  So for -- for classified employees,

24 the process is that a supervisor with the -- with the

25 help of HR would come up with a notice of proposed

47

1  adverse action that would list the cause for action,

2  from 114-528, and they complete that form and they'd

3  have a notice of proposed -- proposed adverse action

4  meeting.

5           In that meeting, the employee, classified

6  employee, could bring a representative with them.

7  They would -- the supervisor would present that

8  particular notice of proposed adverse action.  With

9  that action it is signed off on by the department head

10 not -- noting that that notice of proposed action is

11 going forward.

12          After that notice of proposed -- proposed

13 adverse action--or NPAA--is presented to the employee

14 and they're given that formal notice, then they have

15 five days from that to actually respond to that notice

16 of proposed adverse action.

17          Five business days from that they -- they

18 respond.  Again, they can bring a representative, the

19 supervisor's there.  And the idea is that the

20 department head or someone that can make a decision

21 that they designate is present in that next meeting to

22 see -- to have the -- the employee present their --

23 their case.  So it's a show-cause hearing.

24          Once that's done, three days from that, then

25 there is a notice of proposed adverse action meeting

48

1    where either the proposed action is modified,

2    dismissed altogether, or confirmed.

3            At that meeting, that -- that final notice

4    of -- final adverse action meeting, they're also given

5    their rights to appeal that -- that decision through a

6    Civil Service Board appeal form.  And they're told

7    where to take that and how to appeal it.

8            That form has to be submitted the later of

9    five days from the effective date of the action or

10   five days from that notice of final adverse action

11   meeting, whichever is later.

12        Q.   Was this practice followed in relation to

13   plaintiff?

14        A.   I don't believe that -- that it was.

15        Q.   And do you know why not?

16        A.   My understanding is that she was a

17   unclassified employee.  That being the case, she would

18   be at will and this process would not apply to her.

19        Q.   And is that understanding obtained from

20   anyplace other than counsel?

21            MS. COUNCIL:  Objection to the form of

22        the question.

23            THE WITNESS:  From counsel is where I

24        would -- would -- would know this whole

25        situation from, yes, ma'am.

James Merriweather - March 5, 2020

49

1    BY MS. SCHWARTZ:

2        Q.   But is there anything -- have you talked to

3    anyone else who has told you that she was an

4    unclassified employee?

5        A.   In our meetings that we had, HR -- HR

6    business partner confirmed that and also showed me the

7    exhibit that this -- the exhibit with the dismissal

8    with the unclassified status on the dismissal form,

9    the TAD.

10       Q.   And the HR partner you're talking about, who

11   told you that?

12       A.   Renita Kirkland and the manager Ms. Brown

13   and in the document from the file.

14       Q.   What practice is in place for ensuring that

15   the procedure is followed with a classified employee?

16       A.   Can you clarify what you -- what you mean by

17   that?

18       Q.   Okay.  The procedure of giving notice

19   pre-termination, post-termination, and information

20   about the right to a hearing.

21       A.   So for a classified employee, they can't go

22   forward with the process without the NPAA.  So no

23   action can be taken until the process is followed.  No

24   adverse action.

25       Q.   Well, can't the supervisor just put it

50

1    through?

2         A.   He can.  He had -- the supervisor can submit

3    a notice of proposed adverse action.  They have to --

4    it has to go through that process where they get to

5    respond.  There's a notice of final adverse actions.

6    There's stipulations in the code that say that the

7    process has to be followed a certain way and that

8    there is a timeline between when the -- between the

9    notice of proposed adverse action and the actual

10   effective date of the adverse action.

11             If anything is in violation of that, then

12   that would come out in the Civil Service Board appeal.

13        Q.   But what if they didn't ever get notified

14   that they had the Civil Service Board to appeal to?

15        A.   No action can be taken against somebody who

16   is -- who's a classified employee without that.

17        Q.   Have you had any involvement in

18   investigating behavior of Mr. Beam while he was

19   working for the City of Atlanta?

20        A.   No.

21        Q.   I don't mean investigation may have happened

22   while he was there, but --

23        A.   Where I was involved in --

24        Q.   -- related to his employment with the city.

25        A.   No, ma'am.

51

1        Q.   Are you familiar with any legal action

2   that's going on with regard to that?

3        A.   No, ma'am.

4                 (Marked for identification purposes,

5                 Plaintiff's Exhibit No. 9.)

6   BY MS. SCHWARTZ:

7        Q.   Can you identify this document?

8        A.   Am I familiar with this document?  I don't

9   know what -- it looks like a TAD from a previous time

10  period, but I'm not familiar with it, no, ma'am.

11       Q.   But this shows that Ms. Hendrix was a

12  classified employee at least as of 4-7-98; is that

13  correct?

14       A.   From what I see here, it does show that,

15  yes, ma'am.

16       Q.   And it shows that she was made a permanent

17  employee on this date without changing her position,

18  correct?

19       A.   That's what it seems to say, yes, ma'am.

20       Q.   And do you have any independent knowledge of

21  any new position that she moved into after this date,

22  4-7 of '98?

23       A.   I've been told that she moved into another

24  position subsequent to this date, moved her from

25  classified to unclassified.

52

1      Q.   Who told you that?

2      A.   Ms. Kirkland and Ms. Brown.

3      Q.   And what position do they say she moved

4   into?

5      A.   I don't recall.  I don't recall that.

6      Q.   And did you ask them to show you anything

7   that showed that, any documentation?

8      A.   That was part of what they were preparing

9   for for this particular deposition.  That was not in

10   my lane of questioning that was presented.

11      Q.   Did they tell you what year, approximately,

12   it was that she moved into a different position?

13      A.   I'm not certain of the year, no, ma'am.

14      Q.   Did they indicate to you if there were any

15   other individuals who were familiar with their

16   allegation that she was moved into a different

17   position that was unclassified?

18      A.   I think -- I believe they mentioned Jim Beam

19   as having knowledge of that.

20      Q.   Anyone else?

21      A.   Not that I can recall, no, ma'am.

22      Q.   Have you or anyone, to your knowledge,

23   checked through Mr. Beam's files and email server for

24   any documentation related to Ms. Hendrix?

25      A.   I'm not aware if that's been done, no,

James Merriweather - March 5, 2020

53

1   ma'am.

2          Q.   Who's ultimately responsible for providing

3   any investigation into the facts of this lawsuit?

4               MS. COUNCIL:  Objection to the form of

5          the question.

6               MR. MARTIN:  Objection.

7               THE WITNESS:  That would be outside

8          my -- my purview.

9   BY MS. SCHWARTZ:

10         Q.   You haven't had any discussions with the

11  director of HR about that?

12         A.   No, ma'am.

13              MS. SCHWARTZ:  I have no further

14         questions right now.

15              THE WITNESS:  Yes, ma'am.

16              MS. SCHWARTZ:  Which one of you is going

17         to question?

18              MR. MARTIN:  Right now...

19              MS. SCHWARTZ:  It's only one so...

20         That's the rules of taking a deposition.

21              MS. COUNCIL:  I didn't say anything.

22         Just calm...

23              MR. MARTIN:  Calm down, ma'am.

24              MS. SCHWARTZ:  All right.  I'm just

25         saying.

54

1          MR. MARTIN:  Calm down, ma'am.

2                    EXAMINATION

3    BY MR. MARTIN:

4          Q.   So, now, Mr. Merriweather --

5          A.   Yes, sir.

6          Q.   -- you were shown what was shown to be

7    Plaintiff's Exhibit No. 7.

8               Now, to your knowledge, was this document in

9    use during the time when Ms. Hendrix was employed with

10   the City of Atlanta?

11         A.   Well, it wouldn't have been -- it wouldn't

12   have been Jeffrey Norman because I don't believe he

13   was the interim commissioner at -- at the time.

14         Q.   So had you seen any documents to this nature

15   that had any other different commissioner's name on

16   there?

17         A.   Yeah.  I've seen similar documents, yes.

18         Q.   Similar documents?

19         A.   Uh-huh (affirmative).

20         Q.   So, to your knowledge, was there a document

21   similar to this used?

22         A.   There was a document similar to that, yes,

23   sir.

24         Q.   Now, in regards to that, was that based on

25   policy or practice that this document was used?

1      A.   It was based on practice.

2      Q.   Practice.  Now, was this a long-standing

3  practice or was this something that was relatively

4  used -- relatively within recent times?

5      A.   Can you clarify what you mean by that?

6      Q.   Is this a document that would have been used

7  back in 2010?

8      A.   Not very often, no.

9      Q.   Would this have been a document that would

10 have been used back in 2017?

11     A.   It could have been, yes.

12     Q.   Could have been?

13     A.   Could have been.

14     Q.   But it's a document that's being used now?

15     A.   No.  Because it's just -- it's a -- it's a

16 practice, not a policy.

17     Q.   Okay.  Give me one second.

18     A.   Uh-huh (affirmative).

19     Q.   You had a chance to review Ms. Hendrix's

20 file, correct?

21     A.   Yes, sir.

22     Q.   Did you recall seeing any retention of

23 rights documents in Ms. Hendrix's file?

24     A.   No, sir.

25     Q.   And I may have asked this already, but

56

1   there's nothing in the code that mandates this

2   document, am I correct?

3       A.   No, sir.

4       Q.   And this document P-7.  When you reviewed

5   Ms. Hendrix's file, did you see anything in regards to

6   a Civil Service Board appeal?

7       A.   No, sir.

8       Q.   Did you see anything -- what about a

9   complaint?

10      A.   No, sir.

11      Q.   Did you see any documents where she

12  requested any kind of hearing with the Civil Service

13  Board?

14      A.   No, sir, I didn't see anything like that.

15      Q.   One second.  Was the Civil Service Board

16  paused any time during or around December 2017?

17      A.   No, sir.

18      Q.   What about March 2018?

19      A.   No, sir.

20      Q.   What about at any time during 2018?

21      A.   Not that I recall, no, sir.

22      Q.   Now, in regards to the notice prepared for

23  adverse action, would that be prepared for an

24  unclassified employee?

25      A.   No.

James Merriweather - March 5, 2020

57

1      Q.   So that procedure that you outlined earlier
2   in your testimony, does that only apply to classified
3   employees?
4      A.   Only applies to classified employees.
5      Q.   So when you stated earlier that no adverse
6   action can be done upon an employee, like a supervisor
7   can't just pass it through, I believe was your
8   statement, was that only in regards to classified
9   employees?
10      A.   Only in regard to classified employees.
11      Q.   So in regards to an unclassified employee,
12   what is your understanding of that in regards to any
13   adverse action?
14      A.   They're at will and they can -- we can
15   separate at any time and they can separate.
16      Q.   If an employee wanted a Civil Service Board
17   hearing, could they just come straight to your office
18   to request one?
19      A.   They -- they can make that request.  They
20   could make the request.
21      Q.   Now, what if they believe they're entitled
22   to one, can they just come straight to your office and
23   request one?
24      A.   They could, yes.
25      Q.   And then if they made a request, what would

58

1    happen then?

2         A.   If they made a request, the -- we would

3    require them to -- if it was for adverse action, if

4    it's a Civil Service Board request, we would require

5    them to submit their notice of final adverse action

6    along with their Civil Service Board appeal form, and

7    we would check to see if they were a classified or

8    unclassified employee to see if they have that actual

9    right.

10        Q.   And where would you check to find out if

11   they were classified or unclassified?

12        A.   Primarily it would be the ATL -- ATL Cloud

13   at this time.  Oracle in the past.  If there's any

14   kind of discrepancy, we would check their personnel

15   file.

16        Q.   When you looked in Linda Hendrix's file, did

17   you see anything in regards to that where there was

18   any request made?

19        A.   No.

20        Q.   I want to show you what was Plaintiff's 8.

21             Do you recognize Plaintiff's 8?  It's two

22   pages.

23        A.   From what counsel showed me, yes.

24        Q.   Now, with Plaintiff's 8, is it typical that

25   you see this document on a Gmail format?

59

1      A.    It's not.

2      Q.    Is it typical where you see it with some

3  kind of email information at the top?

4      A.    That's not familiar, no.

5      Q.    That's not a City of Atlanta email up top,

6  is it?

7      A.    It is not, no.

8      Q.    Is that more of a personal email, you think?

9      A.    It looks like a personal email.

10      Q.    On the Oracle document here, do you see any

11  name on there?  Take a look at that.

12      A.    I don't see a name.

13      Q.    Do you see anything that references that

14  that's Linda Hendrix?

15      A.    No, sir.

16      Q.    Now, on the position, it seems -- can you

17  read what the position was?

18      A.    The position is data reporting analyst,

19  senior 4.

20      Q.    Do we have a data reporting analyst, senior

21  4, position to your knowledge?

22      A.    Not to my knowledge.

23      Q.    Now, let me show you Plaintiff's No. 4.

24      A.    Uh-huh (affirmative).

25      Q.    And you've already identified Plaintiff's

James Merriweather - March 5, 2020

60

1    No. 4, am I correct?

2        A.    Correct.  Yes.

3        Q.    And with that document, do you see the

4    person's name on that document?

5        A.    I do.

6        Q.    Does that document show -- what's listed as

7    the job title on that document?

8        A.    Data reporting analyst, senior.

9        Q.    Does it say senior 4?

10       A.    No, sir.

11       Q.    Now, can you say for certain that this is

12   actually an Oracle document?

13       A.    I can't.

14       Q.    Can you say for certain that this was even

15   generated from some Oracle function?

16       A.    I can't say for certain, no, sir.

17       Q.    So can you say for any reason why there may

18   be some discrepancy between whatever this Plaintiff's

19   No. 8 is versus Plaintiff's No. 4?

20           MS. SCHWARTZ:  Object to the form.  And

21       on top of it, there're two totally different

22       dates.

23           MS. COUNCIL:  Can we not make speaking

24       objections, please?

25   BY MR. MARTIN:

James Merriweather - March 5, 2020

61

1     Q.   Can you tell me the difference between the

2  two?

3     A.   This is an actual TAD, Exhibit 4.  Exhibit 8

4  looks like an Oracle printout, but it's -- I've never

5  seen it in this particular format and it doesn't have

6  a name that's visible that I can see.

7     Q.   Okay.

8          MR. MARTIN:  No further questions at

9     this time.

10         MS. SCHWARTZ:  Just a few.

11                  FURTHER EXAMINATION

12  BY MS. SCHWARTZ:

13    Q.   Looking at Plaintiff's Exhibit 8, which I

14  think he may have just taken, so that's yours.

15    A.   Okay.

16         MR. MARTIN:  Found it.

17  BY MS. SCHWARTZ:

18    Q.   Under position, what does it say the

19  position is?

20    A.   Position, data reporting analyst, but the

21  rest is -- is cut off.

22    Q.   On the --

23    A.   Analyst, senior 4.

24    Q.   Where do you see senior 4 under position?

25    A.   Under position...  Data reporting analyst,

James Merriweather - March 5, 2020

62

1    senior dot 4 right there.

2         Q.   I see.  In the position --

3         A.   Uh-huh (affirmative).

4         Q.   -- what's the position number?

5         A.   00020101.

6         Q.   And is that not Ms. Hendrix's position?

7              MS. COUNCIL:  Objection to the form of

8         that question.

9              But you can answer.

10             THE WITNESS:  I believe it is, but I'm

11        not familiar with her position number.

12   BY MS. SCHWARTZ:

13        Q.   You really have no idea, other than that it

14   looks like an Oracle document, as to whether it's

15   true, not true, or whatever?

16        A.   I have no idea, yes, ma'am, that's correct.

17        Q.   And you've never asked anyone about that

18   document, have you?

19        A.   No, ma'am.

20        Q.   And you've never asked anyone in your office

21   as to whether or not Ms. Hendrix came in asking for a

22   hearing, have you?

23        A.   Repeat that again.  I'm sorry.

24        Q.   You've never asked anyone in your office

25   whether Ms. Hendrix came into your office--yours being

63

1   human resources--and --

2        A.    Sure.

3        Q.    -- asked for a hearing?

4              MS. COUNCIL:  Can you phrase it as a

5        question to the witness?  Just for

6        purposes --

7              MS. SCHWARTZ:  I don't need to.

8              MS. COUNCIL:  -- of clarity?

9              MS. SCHWARTZ:  I don't need to.

10             MS. COUNCIL:  Well, I think what you're

11       saying is -- you're leading him.  What I'm

12       saying is can you just phrase it as a

13       question for purposes of the record being

14       clear?  So he can understand your question.

15  BY MS. SCHWARTZ:

16       Q.    Have you ever asked --

17             MS. COUNCIL:  Thank you.

18  BY MS. SCHWARTZ:

19       Q.    -- individuals in your office whether or not

20  Ms. Hendrix came by your office and asked for a

21  hearing?

22       A.    I did.  I asked Ms. Harmon.

23       Q.    Besides Ms. Harmon?

24       A.    Besides Ms. Harmon, no.

25       Q.    And there are other people who work in your

James Merriweather - March 5, 2020

64

1  office?

2       A.   They are -- there are, yes.

3       Q.   And she could have made that request to

4  anyone?

5       A.   All those requests would have come back to

6  me, to our office -- to our group.

7       Q.   Not if they were made to the commissioner,

8  correct?

9       A.   No.  Even if they were made to the

10  commissioner, they would still come back to us because

11  we handle all the CSB matters.

12            MS. SCHWARTZ:  Let's mark this.

13                 (Marked for identification purposes,

14                 Plaintiff's Exhibit No. 10.)

15  BY MS. SCHWARTZ:

16       Q.   Is this the equivalent form that was used

17  prior to the current mayor being in office?

18       A.   It look like an equivalent form, yes, ma'am.

19       Q.   So you used employee acceptance of

20  unclassified position forms before, correct?

21       A.   Yes, ma'am.

22       Q.   And, specifically, this one states that she

23  was serving at the pleasure of the appointing

24  authority and it's dated with her signature, correct?

25       A.   Yes, ma'am.

1       Q.   And did you discuss with Marcia Brown that
2   she went from classified to unclassified?
3       A.   Ms. Brown or Ms. Hendrix?
4       Q.   Ms. Brown.
5       A.   Did I discuss with her about her going...
6       Q.   That's correct.
7       A.   No, ma'am.
8       Q.   Did she tell you that when she originally
9   transferred from classified to unclassified she had
10  retained rights?
11          MS. COUNCIL:  Objection to the form of
12      the question.
13          THE WITNESS:  Was not aware of that, no,
14      ma'am.
15          MS. SCHWARTZ:  I think that's all we
16      have.
17          MR. MARTIN:  I do have two follow-up.
18      Which I'll be very brief.
19                  FURTHER EXAMINATION
20  BY MR. MARTIN:
21      Q.   Earlier you just stated that if a letter was
22  to go -- if a person was requesting with the Civil
23  Service Board to the commissioner --
24      A.   Uh-huh (affirmative).
25      Q.   -- you stated that it would come

66

1    automatically to you?

2         A.   It would.

3         Q.   So in regards to the Civil Service Board,

4    could you clarify, is that -- you're the one that

5    determines whether or not they go before the Civil

6    Service Board?

7         A.   Well, we act on behalf of the commissioner

8    of HR.

9         Q.   So the commissioner of HR wouldn't

10   necessarily see or receive those letters, it would be

11   just -- basically it'll go straight to your office?

12        A.   Right.  And if he received something or she

13   received something, it would then be forwarded to us

14   because we would be -- we're the -- the lead people

15   that handle those appeals.

16        Q.   And in regards to -- when did you start

17   working with the city?

18        A.   2010.

19        Q.   So in regards to Plaintiff's, I guess, 10?

20        A.   Uh-huh (affirmative).

21        Q.   Is this 10?

22        A.   10, yes, sir.

23        Q.   Okay, 10.  I didn't write it on there.  What

24   was the date that Marcia Brown signed this?

25        A.   The 15th.  June 15th, 2004.

James Merriweather - March 5, 2020

67

1      Q.   Were you working with the city at the time?

2      A.   I was not.

3      Q.   So would you have any occasion to talk to

4   her about this?

5      A.   No, sir.

6           MR. MARTIN:  No further questions.

7                (Signature reserved.)

8                (Deposition concluded at 4:08 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

68

1                    E R R A T A   S H E E T

2        I, the undersigned, JAMES MERRIWEATHER, do
   hereby certify that I have read the foregoing
3  deposition and that, to the best of my knowledge, said
   deposition is true and accurate (with the exception of
4  the following corrections listed below.)

5

6

7  PAGE/LINE      CORRECTION (and reason for correction)

8  _____/_____

9  _____/_____

10 _____/_____

11 _____/_____

12 _____/_____

13 _____/_____

14 _____/_____

15 _____/_____

16 _____/_____

17 _____/_____

18 _____/_____

19 _____/_____

20 _____/_____

21

22 _____    _____
   Notary Public                   Signature
23 Date_____

24 My Commission Expires:

25

69

1                    C E R T I F I C A T E

2    STATE OF GEORGIA:

3    COUNTY OF FULTON:

4

5         I hereby certify that the foregoing proceedings
     were reported as stated in the caption and the
6    questions and answers thereto were reduced to writing
     by me; that the foregoing 67 pages represent a true
7    and complete transcript of the evidence given on
     March 5, 2020, by the witness, JAMES MERRIWEATHER,
8    who was first duly sworn by me.

9         I certify that I am not disqualified for a
     relationship of interest under O.C.G.A. 9-11-28(c);
10   I am a Georgia Certified Court Reporter here as an
     independent contractor of Q&A REPORTING SERVICES,
11   INC.; I was contacted by Q&A REPORTING SERVICES,
     INC., to provide court reporting services for this
12   proceeding; I will not be taking this proceeding under
     any contract that is prohibited by O.C.G.A.
13   15-14-37(a) and (b) or Article 7.C of the Rules and
     Regulations of the Board; and by the attached
14   disclosure form I confirm that Q&A REPORTING SERVICES,
     INC., is not a party to a contract prohibited by
15   O.C.G.A. 15-14-37 or Article 7.C of the Rules and
     Regulations of the Board.

16        This, the 17th day of March, 2020.

17

18

19

20

21        _____

22        Jo Tomoff Fischer, RMR
          CCR No. B-924
23        Notary Commission Expires 8-21-2020

24

25

70

1          COURT REPORTER DISCLOSURE STATEMENT
          STATE OF GEORGIA  //  COUNTY OF FULTON
2            DEPOSITION OF JAMES MERRIWEATHER

3

4       I, JO TOMOFF FISCHER, Certified Court Reporter,
    do hereby disclose pursuant to Article 10.B of the
5   Rules and Regulations of the Board of Court Reporting
    of the Judicial Council of Georgia that I am a Georgia
6   Certified Court Reporter; I was contacted by Q&A
    REPORTING SERVICES, INC., to provide court reporting
7   services for this proceeding; I will not be taking
    this deposition under any contract that is prohibited
8   by O.C.G.A. 15-14-37(a) and (b) or Article 7.C of the
    Rules and Regulations of the Board; and I am not
9   disqualified for a relationship of interest under
    O.C.G.A. 9-11-28(c).
10
        There is no contract to provide reporting
11  services between myself or any person whom I have a
    principal and agency relationship nor any attorney at
12  law in this action, party to this action, party having
    a financial interest in this action, or agent for an
13  attorney at law in this action, party to this action,
    or party having a financial interest in this action.
14  Any and all financial arrangements beyond my usual and
    customary rates have been disclosed and offered to all
15  parties.

16      This, the 17th day of March, 2020.

17

18

19

20                      _____
                        Jo Tomoff Fischer, RMR
21                      CCR No. B-924
                        Notary Commission Expires 8-21-2020
22

23

24

25